IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GVANTSA ROBAKIDZE,<br><br>    Plaintiff,<br><br>    v.<br><br>WILD INVESTMENT COMPANY, d/b/a<br>LIFESPORT TENNIS AND ATHLETIC CLUBS,<br><br>    Defendant. | Case No. 24 CV 72<br><br>Judge Georgia N. Alexakis |

## MEMORANDUM OPINION AND ORDER

In August 2023, plaintiff Gvantsa Robakidze was fired from her job as a tennis professional with defendant LifeSport Tennis and Athletic Clubs ("LifeSport"). In this suit, she claims LifeSport violated Title VII of the Civil Rights Act of 1964 ("Title VII") by firing her because of her sex and national origin. LifeSport has moved for summary judgment on Robakidze's claim of national origin discrimination. For the reasons set forth below, the Court grants LifeSport's motion for summary judgment.

### LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it affects the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the nonmoving party,

*see Scott v. Harris*, 550 U.S. 372, 380 (2007). The nonmoving party can defeat summary judgment only by showing that a reasonable jury could render a verdict in its favor. *See Anderson*, 477 U.S. at 248. At summary judgment, the Court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See id.* at 255.

## BACKGROUND

Unless otherwise noted, the facts that follow are undisputed by the parties.

Robakidze is a female tennis instructor whose country of origin is Georgia. [21] at 1. From November 2022 to August 2023, Robakidze taught tennis lessons as a tennis professional, or "tennis pro," at LifeSport. *Id.* ¶¶ 1–2. Gian Remigio, who is Filipino, was Robakidze's direct supervisor. [22] ¶ 2. Remigio reported to Matthew Gordon, LifeSport's Vice President. *Id.*; *see also* [19-8] at 8:10–13.

According to a provision in its employee handbook, LifeSport prohibits tennis pros from teaching, instructing, or training outside LifeSport's premises without prior consent from management. [21] ¶ 6. However, LifeSport contracted with the Sachs Recreation Center ("the Sachs Center") in Deerfield so that its tennis pros could teach lessons there. *Id.* ¶ 18. During the hiring process, Robakidze told LifeSport that it would be difficult for several of her pre-existing clients to travel to LifeSport's Libertyville location to take lessons with her. *Id.* ¶ 16. Because the Sachs Center was closer to some of Robakidze's clients, LifeSport arranged for Robakidze to teach certain lessons there. *Id.* ¶ 17. LifeSport also paid Robakidze $5,000 per year to make

2

up for any lost revenue she might incur from clients who were unable to travel to LifeSport's Libertyville location and the Sachs Center in Deerfield. *Id.* ¶ 19.

In February 2023, the deputy director of the Sachs Center emailed Gordon expressing various concerns with Robakidze using the Sachs Center to teach lessons. *Id.* ¶ 20; *see also* [19-10]. The deputy director complained, for example, that Robakidze repeatedly failed to provide accurate lists of lessons for the day, resulting in clients being incorrectly billed for lessons that never took place. [21] ¶ 21; [19-10]. He also described that, after being told the proper processes, Robakidze "seem[ed] indifferent to anything anyone [said]" and acted almost as though "she [was] from another planet." [21] ¶ 22; [19-10]. The deputy director complained that Robakidze's behavior was "too much at this point" and concluded that he "would prefer that she [ ] not teach here any longer." [21] ¶¶ 22, 24; [19-10].

In response to this email, LifeSport informed Robakidze that she could no longer teach lessons at the Sachs Center. [21] ¶¶ 26–27. However, LifeSport offered to let her teach at its Lincolnshire location because it was a more convenient location for some of her clients. *Id.* ¶ 27. But instead of teaching these clients at the Lincolnshire location, Robakidze taught them offsite without going through LifeSport's billing processes. *Id.* ¶ 28.[1]

In July 2023, a LifeSport client purchased three lessons for their grandchild as a gift. *Id.* ¶ 36. Brad Warren, a LifeSport member services employee, instructed

---

[1] Robakidze does not deny this fact in her response to LifeSport's Rule 56.1 statement; she merely denies that her offsite lessons were "done secretly or without consent inasmuch as Remigio told Plaintiff that he knew about it." [21] ¶ 28. The Court deems the fact admitted except to the extent Remigio may have known the lessons were taking place offsite.

3

Robakidze to contact the client to schedule the lessons. *Id.* A few days later, the child's mother called back saying she had not heard from anyone to schedule the lessons, so Warren again asked Robakidze to contact the client about scheduling the lessons. *Id.* ¶ 37–38; *see also* [19-14] at 1. Shortly thereafter, Warren received a call from the child's father asking why his child would have to travel to an offsite court for the tennis lessons.[2] [21] ¶ 39.

Gordon confronted Robakidze about the situation during a meeting with Robakidze and Remigio on August 4, 2023. *Id.* ¶¶ 41–42. During this meeting, Robakidze admitted to Gordon and Remigio that she had been teaching private lessons offsite without LifeSport's consent.[3] *Id.* ¶ 43. LifeSport terminated Robakidze effective that day. *Id.* ¶ 45.

According to LifeSport's Rule 56.1 statement, the "trigger for Robakidze's immediate firing was the newfound knowledge that Robakidze was teaching offsite without management's prior consent." *Id.* ¶ 47. Yet LifeSport also says that it

---

[2] Robakidze objects to this statement as inadmissible hearsay. *See* [21] ¶ 39. But the statement is not hearsay because it is not being offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c)(2). Rather, the statement is offered to explain why Gordon confronted Robakidze about teaching lessons offsite during the August 4, 2023 meeting. *See United States v. Graham*, 47 F.4th 561, 567 (7th Cir. 2022) ("Statements introduced to show their effect on the listener are not offered to prove the truth of the matter asserted and therefore are not hearsay.") (cleaned up). Here, because Robakidze later admitted to teaching other lessons offsite without permission, *see* [21] ¶ 43, LifeSport need not prove that Robakidze planned to teach lessons to this particular student offsite.

[3] Robakidze denies this fact in her response to LifeSport's Rule 56.1 statement, but her only justification for doing so is that "Remigio texted Plaintiff that he was aware that she (and others) taught lessons offsite." [21] ¶ 43. She does not give any factual basis for denying that she admitted to teaching private lessons offsite during the meeting with Gordon and Remigio, so the Court deems that portion of LifeSport's statement admitted. *See* N.D. Ill. L.R. 56.1(e)(3) ("To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."). In any case, Robakidze also admitted in written discovery responses that she told Gordon and Remigio during the August 4, 2023, meeting that she had been teaching lessons offsite without permission in her response to LifeSport's first set of interrogatories. *See* [19-3] ¶ 19.

4

terminated Robakidze "not only because it learned she was teaching private tennis lessons offsite without management's prior consent but because her already substandard job performance was not improving." *Id.* ¶ 46. In support of Robakidze's substandard job performance, LifeSport references two alleged meetings between Remigio and Robakidze in which they discussed Robakidze's need to improve her performance. *Id.* ¶¶ 29–31. Robakidze denies that these meetings ever occurred. *See id.* Remigio says that he wanted to fire Robakidze after the second of these meetings, but Gordon suggested that she be allowed more time to improve. *Id.* ¶ 34.

LifeSport also produced an October 2023 email from Remigio to Gordon detailing the various issues he observed with Robakidze's job performance. *See* [19-12] at 1. Among other complaints, the email states that Robakidze was frequently on her phone during group classes, only provided students negative feedback, missed more than 10 classes for inappropriate excuses, and exhibited a lack of energy on the court. *Id.*

The night LifeSport fired Robakidze, Robakidze sent Remigio the following text:

> Hey Gian, I just wanted to say that it was fun working with you all and I'll definitely miss working with the guys! I just had an honest question, you mentioned to me not too long ago that you knew that Ken and Sidney were teaching outside over the summer while they were working there at LifeSport and yet they were not fired for that. Do you think it was fair to fire me after all I've done all because I had one or two students outside because they physically could not drive to Libertyville?

[21] ¶ 53; *see also* [19-16]. Remigio responded with the following:

> I knew yours too but I pretend I dont [sic] knew [sic] it like them because I have no proof even with them, and who knows what other pros [sic]

5

> doing… The one that triggered is the Member from the club that called Matt that you want to take them somewhere else…

[21] ¶ 55; *see also* [19-16]. Although Robakidze's initial text suggested she had only taught "one or two students" offsite, Robakidze admitted in her deposition to teaching at least nine students offsite. [21] ¶ 54.

LifeSport says that "[p]rior to Robakidze's situation, the company never had definitive proof of any tennis pro employees who [were] providing unauthorized offsite lessons."[4] *Id.* ¶ 49. On a number of instances since Gordon began working for the company in 1998, Gordon had "significant suspicion that a tennis pro was teaching offsite without management's prior consent." *Id.* ¶ 50. On each occasion, however, the tennis pro denied teaching offsite when Gordon confronted them. *Id.* ¶ 51. On one occasion, Gordon went to local parks where he suspected that a tennis pro was teaching offsite but could not find the tennis pro teaching there. *Id.* ¶ 52.

In January 2024, Robakidze filed suit against LifeSport, claiming that LifeSport violated Title VII by discriminating against her based on her sex (Count I) and her national origin (Count II). *See* [1] ¶¶ 9–34. Now before the Court is LifeSport's motion for summary judgment on Robakidze's Count II claim for national origin discrimination. [17].

---

[4] Robakidze denies this statement and cites to her own deposition testimony that Remigio told her he knew "full well" that others were teaching outside LifeSport. [21] ¶ 49 (quoting [21-9] at 81–82). However, because Robakidze's statement about what Remigio purportedly said is inadmissible hearsay (an objection that defendant makes), the Court cannot consider it on summary judgment. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009) ("To defeat a summary judgment motion, [ ] a party may rely only on admissible evidence."); *see also* Fed. R. Evid. 802; [22] ¶ 12. And because Robakidze has not offered any other evidentiary support to challenge the statement, the Court deems it admitted that the company never had "definitive proof" of other tennis pros teaching offsite. *See* N.D. Ill. L.R. 56.1(e)(3).

## DISCUSSION

Title VII makes it unlawful for employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In this suit, Robakidze claims that LifeSport violated § 2000e-2(a)(1) by firing her because of her sex and national origin. *See* [1] ¶¶ 9–34. LifeSport concedes that her sex discrimination claim is "unsuited for disposal on summary judgment," so it moves for summary judgment only on Robakidze's national origin discrimination claim. *See* [18] at 1 n.1.

A plaintiff making a Title VII claim may use multiple approaches to show discrimination at the summary judgment stage. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). One way is through the burden-shifting framework the Supreme Court adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, "the plaintiff has the initial burden of establishing that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer's legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *David*, 846 F.3d at 225 (cleaned up) (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014)). "If the plaintiff satisfies that burden, then the employer must articulate a legitimate,

nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (quoting *Andrews*, 743 F.3d at 234).

LifeSport does not dispute that Robakidze is a member of a protected class and was subject to an adverse employment action. *See* [18] at 10. It does, however, challenge whether Robakidze was meeting LifeSport's legitimate job expectations and whether similarly situated individuals outside her protected class received better treatment. *See id.*

Starting with the former, it is undisputed that Robakidze was not meeting LifeSport's legitimate expectations at the time of her discharge. LifeSport had a reasonable policy prohibiting its tennis pros from teaching outside LifeSport's premises without prior consent from management, *see* [21] ¶ 6, and Robakidze admitted to teaching at least nine students offsite without LifeSport's permission, *see* [19-2] at 86:14–88:5; *see also* [19-3] ¶ 19; [21] ¶¶ 12, 54. Plaintiff admitted that she taught these students offsite during the meeting with Gordon and Remigio on the day she was terminated.[5] [21] ¶¶ 12, 43; *see also* [19-3] ¶ 19.

---

[5] To show that Robakidze was not meeting LifeSport's legitimate expectations, LifeSport also relies on the two meetings in which Remigio and Robakidze supposedly discussed Robakidze's poor job performance. *See* [18] at 11. But Robakidze disputes that these meetings ever occurred. *See* [21] ¶¶ 29–31. LifeSport also references the incident with the Sachs Center, but Gordon made clear during his deposition that this earlier incident was not a factor in LifeSport's decision to fire Robakidze, *see* [19-8] at 33:17–34:10, and Robakidze does not dispute that representation, *see* [21] ¶ 22. For purposes of resolving whether there is a genuine dispute of material fact as to whether plaintiff was meeting LifeSport's legitimate job expectations, the Court therefore focuses on Robakidze's undisputed admission that she was violating LifeSport policy by teaching clients offsite. *See* [19-2] at 86:14–88:5; *see also* [21] ¶ 12; [19-3] ¶ 19.

8

Even if Robakidze could show that she was meeting LifeSport's legitimate expectations, Robakidze must show "similarly situated employees outside of her protected class were treated more favorably." *David*, 846 F.3d at 225. "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). Similarly situated employees "must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Id.* (cleaned up) (quoting *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)). "In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Robakidze attempts to meet this requirement in two ways. First, she says she was treated less favorably than non-Georgians because lessons were removed from her and reassigned to Filipino tennis pros. *See* [20] at 6. But the only tennis pro who received reassignments from Robakidze was Darko Mihajlovic, and Mihajlovic is Serbian, not Filipino. *See* [21] ¶¶ 65, 67. In any case, Robakidze has not shown that similarly situated non-Georgian tennis pros were not *also* subject to the same types

9

of reassignments. For all the Court knows, the Filipino tennis pros also had lessons reassigned to Mihajlovic. Robakidze does not say otherwise.

Second, Robakidze claims that similarly situated Filipino employees were not fired for teaching lessons offsite even though LifeSport knew they were doing so. *See* [20] at 6. But Robakidze has provided no details about these employees from which the Court can determine whether they were "directly comparable to the plaintiff in all material respects." *Patterson*, 589 F.3d at 365–66. Moreover, LifeSport has identified a key difference between Robakidze and these other tennis pros: Although LifeSport may have *suspected* that they were teaching offsite, LifeSport never had any definitive proof. *See* [21] ¶ 57; *see also supra* n.4. When LifeSport confronted other pros about teaching offsite, they denied it. *See* [21] ¶¶ 50–51. In contrast, during the August 4, 2023 meeting, Robakidze admitted to breaking the prohibition on teaching offsite. *See id.* ¶¶ 12, 43; *see also* [19-3] ¶ 19. The texts between Robakidze and Remigio on the night Robakidze was fired highlight this difference. In response to Robakidze's suggestion that she was treated differently from two Filipino employees who were suspected of teaching lessons offsite, Remigio said he had "no proof even with them, and who knows what other pros doing [sic]." [21] ¶ 55; *see also* [19-16]. Because this difference is undisputed, Robakidze cannot show that she and the other employees engaged in "similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman*, 667 F.3d at 847 (quoting *Gates*, 513 F.3d at 690).

10

Even if Robakidze were to make a *prima facie* showing on the first step of the *McDonnell Douglas* framework, LifeSport has offered a legitimate, nondiscriminatory reason for her firing: Robakidze admitted to teaching offsite without management's permission.[6] *See* [21] ¶¶ 12, 43; [19-3] ¶ 19. To succeed under the *McDonnell Douglas* framework then, Robakidze would need to show that the employer's stated reason is pretextual. *See David*, 846 F.3d at 225. "Pretext 'means a lie, specifically a phony reason for some action.'" *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002) (quoting *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995)). An employer's reasoning is not pretext so long as it "honestly believed it made the correct employment decision—even if its decision was inaccurate, unfair, foolish, trivial, or baseless." *Barnes-Staples v. Carnahan*, 88 F.4th 712, 716 (7th Cir. 2023) (cleaned up) (quoting *Coleman*, 667 F.3d at 852–53).

Robakidze argues in her response that "there is ample evidence of pretext," but she does little in the way of explaining how LifeSport's stated reasoning was a lie. [20] at 6. In addition to points the Court already has addressed, Robakidze asks the Court to take judicial notice of the proportion of the Libertyville population that is Filipino. *Id.* at 7. From there, she asks the Court to presume there is a disparity between the proportion of Filipinos employed at LifeSport and the proportion of

---

[6] As discussed, in addition to its newfound knowledge that Robakidze was teaching lessons offsite, LifeSport also says it fired Robakidze "because her already substandard job performance was not improving." [21] ¶ 46. Because the facts underlying Robakidze's alleged substandard performance are disputed, *see id.* ¶¶ 29–35, the Court again focuses on the undisputed evidence that Robakidze admitted to teaching lessons offsite without LifeSport's permission to do so, *see* [21] ¶¶ 12, 43; [19-3] ¶ 19, in resolving whether LifeSport has proffered a legitimate, nondiscriminatory reason for firing Robakidze. As a result, the Court does not need to address Robakidze's argument that the complaints in Remigio's October 2022 email to Gordon included unlawful reasons for firing her. *See* [20] at 5.

11

Filipinos in the Libertyville population. *See id.* ("The number of Filipino[s] employed by Defendant indicates that there must be a favoritism at play."). Even assuming this alleged disparity is real, without more evidence, no reasonable jury could find LifeSport's justification was pretextual merely because LifeSport employs a greater proportion of Filipinos than are present in the community at large.

Robakidze also says LifeSport's reasons for firing Robakidze are "contradictory" and "not clear and specific." [20] at 4. The Court disagrees. LifeSport says that Robakidze's firing was "trigger[ed]" by its "newfound knowledge" that she was teaching offsite, [21] ¶ 47, and LifeSport also maintains that it fired her because her "already substandard job performance was not improving." *Id.* ¶ 46. Robakidze does not attempt to explain how these two reasons are contradictory, and the Court sees no tension between them either. It is more than plausible that Robakidze's performance *and* her failure to abide by LifeSport's policy played a role in LifeSport's decision to fire her. The admitted-to policy violation may have been the straw that broke the camel's back, but termination on those grounds would not be inconsistent with termination for previously subpar performance.[7] *See Creal v. Springhill Ford,*

---

[7] LifeSport says in its reply brief that Robakidze was fired for the "one simple reason" that she was teaching offsite without consent. *See* [23] at 8; *see also id.* at 4. But this contradicts LifeSport's representations—both in its opening brief and its Rule 56.1 statement—that it fired Robakidze both because of her job performance and because she was teaching lessons offsite without permission. *See* [21] ¶ 46 (LifeSport stating in its Rule 56.1 statement that it "terminated Robakidze *not only* because it learned she was teaching private tennis lessons offsite without management's prior consent but because her already substandard job performance was not improving") (emphasis added); *see also* [18] at 1, 5 (reciting the same in opening brief). Still, the Court does not find this discrepancy in the briefing enough to show that LifeSport's stated reasoning was pretext, especially given the lack of supporting evidence that LifeSport discriminated against Robakidze because of her national origin. *Contra Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005) (finding evidence of pretext where an employer's justification for hiring another employee over plaintiff had changed over time); *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 739 (7th Cir. 2013) (noting that defendant's "ever-evolving justifications" for employee's termination were evidence of pretext).

12

*Inc.*, No. 06 C 0175, 2007 WL 3120106, at \*6 (N.D. Ill. Oct. 19, 2007) ("[G]iven that an employer can terminate an employee for multiple, legitimate reasons, the fact that the record contains more than one statement of why [plaintiff] was fired only helps [plaintiff] if those statements are inconsistent with one another or the underlying facts in such a way as to suggest a lie."); *see also Stodola v. Finley & Co.*, No. 2:05-CV-464-PRC, 2008 WL 3992237, at \*13 (N.D. Ind. Aug. 21, 2008) ("That Defendants offer several reasons for [plaintiff's] termination does not alone show pretext.").

Although the *McDonnell Douglas* framework is one way a plaintiff can establish causation in the Title VII context, a plaintiff can also show causation under the more holistic approach in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). This approach simply asks "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [national origin] … caused the discharge." *Id.*; *see also McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 369 (7th Cir. 2019). For the reasons already discussed, Robakidze has not met her burden to show that her national origin was the reason for her firing. Robakidze's evidence that LifeSport favored Filipinos over other employees with different national origins is virtually nonexistent. Although two Filipinos who previously worked at LifeSport may have been suspected of teaching lessons offsite, LifeSport has established that it never had definitive proof they were doing so. Nor is the Court convinced by Robakidze's argument that Filipinos make up a greater share of LifeSport's workforce compared to the greater community. Even assuming that were true, that fact alone does not lead to the inference that she was fired because of her national origin.

Without more, Robakidze's Title VII claim for national origin discrimination does not survive summary judgment.

## Conclusion

For the reasons discussed, the Court grants LifeSport's motion to dismiss Robakidze's Count II claim for national origin discrimination under Title VII. The parties are directed to appear on 6/18/25 for a status hearing to discuss next steps in the case, including setting a trial date on Count I and the possibility of settlement.

_____
Georgia N. Alexakis
United States District Judge

Date: 5/23/25